DISTRICT COURT. ·                    APRIL 8, 1859.

### ADMIRALTY.

## MILLER AND OTHERS, MARINERS OF THE BARQUE CHARLOTTE E. TAY, v. SAILS, RIGGING, AND CERTAIN LOOSE ARTICLES SAVED FROM THE CHILIAN SHIP MARTINEZ DIAZ.

1. When a ship at sea was on fire, and there was no hope of saving her, a transfer was made by her captain of all things in her belonging to her owners that could be saved, as a compensation to the navigators of another vessel for receiving himself and his crew with their own personal effects on board of the latter vessel. This transfer conferred upon the navigators of the latter vessel no property in things which they saved from the burning vessel, belonging to her owners.

2. The arrangement was of no effect as an agreement for a salvage compensation. Such an appropriation of the *whole* of her owners' property that might be saved was repugnant to the nature of salvage.

3. The arrangement was unreasonable if not extortionate; and viewed in connection with subsequent endeavors to take advantage of it which manifested an entire disregard of the rights and interests of the owners of the things saved, might have precluded the recovery by the captain of the vessel whose company saved them, of any share of salvage compensation to which he would otherwise have been entitled.

4. A claim of salvors for compensation ought in this case, to have been

prosecuted, on arrival at the first port where it could have been conveniently brought before an established tribunal of maritime jurisdiction.

5. The vessel whose company saved the things, having arrived, in possession of them, at a port where such a tribunal was established, and where no adequate reason prevented a prosecution of the claim, omitted to prosecute it there, and carried the things saved to her home port which was remote from this first port of arrival and also from the known place of ownership of the things saved. Her mate and others of her crew, claiming salvage under proceedings instituted at her home port, it was held that, as her master and owners could not, under such circumstances, have recovered, the mate, though one of those who had boarded the burning vessel, could not recover. He was an officer whose capacity to institute and prosecute, independently of the captain, legal proceedings at an intermediate port of a voyage was recognized by law, and, therefore, was not exempt from the operation of the rule which would have been applicable to a claim at the suit of the master or owners.

6. The rule thus applicable to the master, owners, and mate was applied against subordinate navigators who did not leave their own vessel. An exemption in their favor could not be admitted on any principle on which exceptions from the rule would not be inconveniently multiplied.

7. But, a partial exemption was allowed, and a limited salvage compensation decreed in favor of such of her subordinate mariners as had boarded the burning vessel.

8. A libel at the suit of these mariners against the things saved from the lost vessel, and against the master of their own vessel, presented a subject of admiralty jurisdiction, compounded of that exercised in salvage cases and that exercisable for ascertaining the ownership and preventing the misappropriation of property saved or found at sea.

9. But, under such a libel process was not awarded against their own vessel or against her owners.

10. When owners of property (other than a vessel) in custody of the Court are absent and not represented, though the property may be liable to some deterioration from its retention, a sale of it will not be ordered unless it is absolutely perishable, or so chargeable as not to be worth preserving.

11. The price obtainable at a peremptory judicial sale being usually much below the fair value of the thing sold, such a sale is not legally regarded as a test of its value. An absolute sale, therefore, of property in the Court's custody will not be ordered before adjudication unless the probable deterioration in value from retention exceeds the proportion which the probable sacrifice bears to the fair value.

Libel for Salvage. The facts will fully appear in the opinion.

## CADWALADER, J.

This is a case of salvage. The libellants were the crew of the barque Charlotte E. Tay, A. S. Hughes, master, on a

voyage begun on 23d January, 1858, from Philadelphia to Rio de Janeiro and back. On the 22d of February, 1858, when distant from Rio six days' sail, and from the Pernambuco coast between 300 and 350 miles, a vessel astern and to windward was descried making signals of distress, and, soon after, was observed to be on fire. She afterwards proved to be the Chilian ship Martinez Diaz, owned by Ramon Martinez Diaz & Co., of Valparaiso, then on a voyage to that port from Boston with a company of 25 persons. The Tay hove to, and waited for her to come down. At about 9 o'clock in the morning, the Chilian vessel being then about half a mile distant, one of her boats, containing her captain, second mate, and four of her crew, came alongside of the Tay. The Chilian captain came on board of the Tay and begged assistance. He endeavored unsuccessfully, by liberal offers, to induce Captain Hughes to deviate from the course of his voyage, and take them to Pernambuco, which was the nearest port. He offered to Captain Hughes, as the mate of the Tay deposes, a note or bill for $2,000 as an inducement to remain by him the rest of the day and all that night, so that he could run the ship ashore. In the relative position of the vessels to any shore, it is not easy to understand how this can have been the precise character of the proposal. Captain Hughes declared himself willing to take on board of his vessel all persons who were in the burning ship, and carry them and their personal effects to Rio, the port of his own destination. He rejected all other proposals, as his vessel, bound to a market and laden with flour, was *running against* two other vessels similarly laden. No vessel other than the Tay was then in sight. The Chilian captain acquiesced, having no other recourse. In rejecting his proposals, Captain Hughes does not appear to have acted unwisely or unkindly. On the contrary, his decision appears to have been conformable to his duty to his employers. The Chilian captain then said to Captain Hughes what the steward states to have been spoken in plain English in the following words: "He told our captain that all they wanted was their own private property, and *everything else you can save, you take it.*" As the second mate

deposes: *"The Spanish captain said to our captain that we could take all we could save from the vessel."*   This appears to have been intended by the Chilian captain as an indiscriminate and unlimited bestowal of his employer's property, under his care and protection, upon the company of the Tay, as a compensation for saving the lives of himself and the other persons in the Chilian vessel, and permitting them to take out of her their own personal effects.   It was, at all events, thus understood on board of the Tay.   Her captain ordered her mate to go on board of the burning ship.   The purpose of this order probably was that the mate should ascertain whether anything valuable belonging to her owners could be saved. The captain of the Chilian vessel then returned to her in the same boat in which he had come, taking with him the mate of the Tay.   Though there is testimony that some others of the crew of the Tay accompanied the mate in this boat, the mate himself states the contrary; and the truth appears to be that he was the only person other than the six Chilians who then left the Tay.   When he reached the Chilian vessel, her three hatches were on fire, and the fire and smoke were ascending from them, and her stern was on fire.   He says: "It was almost suffocation."   The crew, he says, "could not go below, under the hatches," but *"could go into the cabin and forecastle."* He states that they went to get their clothing, when he, thinking that *some of the sails could be saved,* hailed the Tay, and told Captain Hughes to send her boat, as the Chilian vessel's boat was not in good order.   Captain Hughes then sent a boat from his vessel, manned by some of her crew, to the Chilian vessel.   His orders were to cut adrift the sails and everything else worth saving.   He had previously ordered his men who were to board her to sharpen their knives for the purpose. When this boat reached the Chilian vessel, her captain said to the mate of the Tay: "Now you have charge of the vessel, save all you can," and told the men that there was a new suit of sails below, but he did not suppose that they could be got at. An effort was made to reach them, but it was unsuccessful. The men from the Tay then went to work on deck and above,

and cut away some sails and rigging, which, with some loose articles, including some provisions, were saved. Several trips appear to have been made by the boats of the two vessels, those of · the Chilian vessel containing the private property of her captain and crew, and those of the Tay containing such other articles as the men of her crew who boarded the Chilian vessel were able to save. All · the company of the Tay except her captain, the steward, and a boy, were, at one time or another, on board of the burning vessel. The steward says: "By the time that the Chilians had put all their things on board, our mate and men were ordered on board by the captain, he saying that he would not allow them to stop any longer than was necessary to save the things of the Chilians." The mate of the Tay says that he was on board of the Chilian vessel for an hour and a half. He seems to have remained on board the whole time from his reaching her in her own boat, and to have left her in the boat of the Tay, which made the last trip between the vessels. Other witnesses depose that the time passed on board was much longer; but they are probably less accurate. In the meantime the flames had begun to spread over the deck. No actual danger appears to have been incurred by those who boarded her, though it would have been dangerous to remain longer than they were on board. Before the mate of the Tay returned to her, all the Chilians were on board of her in safety. It would have been impossible to save the Chilian vessel, whose mainmast soon afterwards fell.

The mate of the Tay says that the whole time of her detention on her voyage was from ten to twelve hours. The Chilians were taken free of charge to Rio de Janeiro and there landed in safety. They had received, before and after they were taken on board of the Tay, about as much assistance in their distress as the laws of humanity imperatively required, but certainly no more.

The Tay remained nearly a fortnight at Rio de Janeiro. No proceeding to recover a salvage compensation was instituted there. The Chilian captain, who was there four or five days, adopted no measure to reclaim his owners' property which was

on board of the Tay.   This negative confirmation of the testimony that he had intended to transfer their property absolutely to the Tay's company gives to this evidence a credibility not otherwise attributable to it.   I, therefore, assume that an absolute gift or transfer, so far as he may have had the power to make it, was really made.

The Tay returned from Rio de Janeiro to Philadelphia, where she arrived on or about the 23d of April.   Her owners, Rutter, Newhall & Co., of Philadelphia, acting with great propriety, adopted immediate measures to find the agents in this country of the Chilian owners of the articles saved.   Rutter, Newhall & Co. made no claim on their own behalf to any compensation otherwise than by suggesting that the amount due for salvage was to be ascertained.   The articles which had been saved were taken, or were about to be taken, to the Custom House at Philadelphia, when the crew, becoming apprehensive that it was intended to deprive them of their share of the salvage, instituted the present proceedings.   The libel was exhibited on the 30th of April, 1858, the day on which Messrs. Rutter, Newhall & Co., without any knowledge of the proceeding, began their correspondence with Boston to discover the agent of the Chilian owners.

It was a libel against the Charlotte E. Tay, and her master, and the articles saved from the Chilian vessel.   The original libellants were all of the crew of the Tay except the first mate. There was orginally no allegation on the subject of the transfer by the Chilian captain of the articles saved.   The libellants asserted that they were entitled to a salvage compensation, and prayed process not only against the things which had been saved, but also against the Tay and her master.

On 1st of May, 1858, no process having been as yet awarded, the libel was amended by the insertion of an allegation that the articles had been "given by the captain of the said ship to the master of the said barque as a consideration for saving said captain and his crew"; and the addition of an allegation to the effect that the libellants were entitled to extra wages or compensation "as *quasi* salvage," the articles "having

been absolutely given over to the said master of the said barque in consideration of saving the lives of the captain and crew of the said ship Martinez Diaz and carrying them to Rio de Janeiro." The libellants averred also that some of the articles saved had been used by the master of the barque in her service.

Process in personam was awarded against Captain Hughes, and process in rem against the specific articles saved. But the Court refused to award process against the vessel or her owners.

The articles saved were arrested and personal service of process was made upon Captain Hughes. He has not appeared, or intervened. The owners of the Tay have not intervened. Her first mate on the voyage in question has been since added as a party libellant. On 25th May, 1858, an agent at New York of the Chilian owners interposed a claim and answer, on the subject of which no communication can then have passed between him and his principals. This answer admitted the material allegations of the libel except those relating to the gift or transfer by the Chilian captain, as to which it alleged ignorance and required proof if it was deemed material.

The claim of the libellants to a reasonable salvage compensation has neither been disputed nor directly conceded. The Chilian owners do not appear to have been at any time directly represented in the cause, under specific instructions, or under a general authority immediately from themselves. No concession or waiver of any defence has been made on their part.

The case, therefore, should, first, be considered with reference to the transfer by the Chilian captain; and should, afterwards, be considered independently of this transfer, as the case of a claim for salvage.

The Chilian captain, of course, had no power to make a gift of what was not his own. The arrangement between the two captains was, therefore, of no effect unless it can be supported as an *agreement for compensation to salvors*.

No stipulation for a payment of money, or transfer of property, as a compensation for saving human life at sea can be recognized in a Court of Admiralty as of any effect. Inde-

pendently of this doctrine, an agreement for compensation to a salvor of *property* made at a crisis of marine peril, is never enforced in his favor unless it is reasonable; and an agreement that the salvor shall, in any case, have the *whole* that may be saved is essentially repugnant to the nature of the *salvage* contract.   When property of different ownerships is involved in common peril, the whole property of a particular owner may sometimes, by way of a sacrifice for the common safety, be appropriated in discharge of the reasonable claim of a salvor to compensation for a service in the benefit of which all the owners have participated.   But, in such a case, his loss, beyond his just proportion, is made good, as a general average, by a ratable contribution which may be enforced against the owners. The present case, however, bears no resemblance to one of general average.   The two captains appear to have inexcusably mistaken their duties and rights.   The act of the Chilian captain was an unauthorized appropriation of the articles in question; and, if it could have taken effect as intended, would have been a wrongful conversion of them by him to the use of the Tay and her company.   From such an act, the navigators and owners of the Tay, therefore, can derive no benefit.

The Supreme Court, in language of the Chief Justice, have said: "In times of disaster, it is always the captain's duty to exercise his best judgment, and to use his best exertions for the benefit of the owners of both vessel and cargo, and when, from his situation, he is unable to consult them, or their agent, without an inconvenient and injurious delay, it is in his power to compromise a question of salvage; and he is not bound, in all cases, to wait for the decision of a Court of Admiralty.   So, too, when the salvage service has not been important, and the compensation demanded is a small one, it may often be the interest of the owners that the amount should be settled at once by the captain, and the vessel proceed on her voyage, without waiting even a day for the purpose of consulting them. But, in all such cases, unless the acts of the captain are ratified by his owners, his conduct will be carefully watched and scrutinized by the Court, and his contracts will not be regarded

as binding upon the parties concerned, unless they appear to have been bona fide, and such as a *discreet owner, placed in the like circumstances, would have made.* If he settles the amount by agreement, those who claim under it *must show* that the salvage allowed was *reasonable and just.*" (15 Peters, 45.)

In the case from which this passage is extracted, it was the opinion of the Court that salvors who had endeavored to take advantage of an arrangement fraudulently made by a captain, at the crisis of alleged peril, without any regard to his owners' interest, had, by this conduct, "*forfeited all claim to compensation even for the service actually rendered.*" (Ib. 48.) I have recently, in the case of the Arcole, had occasion to consider the effect of extortionate bargains exacted by salvors from navigators of ships in distress or danger. In the present case the arrangement was unreasonable, if not extortionate. The subsequent conduct of the captain of the Tay has manifested a disposition to take advantage of it, with an entire disregard of the rights and interests of the owners of the things saved. The previous arrangement between the two captains, in connection with this conduct of Captain Hughes, would therefore, if he were one of the libellants, and a salvage compensation should be decreed, preclude him perhaps from recovering any share of such compensation. But his crew, and the owners of the vessel, would not, for this reason, forfeit their shares.

Had proceedings for salvage been instituted at Rio de Janeiro, the case would have been a proper one for the allowance of a moderate compensation to the *other* navigators and the owners of the Tay. The uncertainty of the available value of the articles saved is very great, as will be stated hereafter. Had the same uncertainty existed there, a certain sum would probably have been allowed, instead of a proportionate part of the things, or of their value. As no particular merit was attributable to the salvors, $150 would have been quite an adequate compensation. Of this amount, one-third would probably have been awarded to the owners of the Tay, leaving $100 for her company. The latter amount, if Captain Hughes had

been entitled to participate in the distribution, might have been divided into fifty-one shares, of which he would then, perhaps, have been entitled to twelve, the first mate, Charles William-son, to eight, the second mate, Charles Miller, and seamen William White, Henry Strobel, Asa Quinn, Samuel Williams, John Day, and Frank, all of whom boarded the burning vessel, seven persons, each to four shares, Wm. Blankbois, the steward, who remained in the Tay, to two shares, and a boy, who re-mained in her, to one share.

The objection to such a decree in the case as it now stands, arises from the omission to prosecute the claim for salvage at Rio de Janeiro. The salvors, in carrying the things saved to their own vessel's home port, distant six or seven weeks'. sail from the port of arrival, and remote from their place of ownership, committed an act which, if not one of mal-appro-priation, was of a not less injurious effect, or tendency. Such a transportation of things which have been saved at sea from one part of the world to another, if legally sanctioned, would soon become a method of embezzlement by pretended salvors.

The right of a salvor to proceed for his compensation against the *thing* saved or benefited by the salvage service depends upon his *lien* on the subject of the service. His duties and his rights in respect of this lien must be, to some extent, reciprocal. Possession of the subject is not required in order to originate or preserve this and many other maritime liens which are en-forced in Courts of Admiralty. It has been judicially said that the foundation upon which salvors are at any time allowed to retain possession of the subject of their service is to secure their demands upon its owner. (2 W. Rol. 312, 313.) A salvor in possession, therefore, holds possession for the sole purpose of enforcing his lien. Subject only to the lien, he holds the thing in trust for its owner. A wilful abuse, or vio-lation in any material particular, of this trust, determines the lien. The breach of trust is palpable and gross when the thing is unnecessarily carried by the salvor for his own convenience to a distant port inconvenient to the owner.

Marine salvors in possession ought always, therefore, unless

prevented by some adequate cause, to proceed against the effects
in their hands, without unnecessary delay, at the first port
reached where a proper tribunal for the adjudication of ques-
tions of maritime salvage is established. When they are not
in actual possession they may sometimes use even force to pre-
vent the owner of the things saved or benefited from removing
it from such a port. (La Bruce Marvin S. 138.) In the case
of the Nicolai Henrich, a salvage service was rendered off the
English coast by an English fishing lugger to a Prussian vessel
bound to London. The salvors brought the Prussian vessel
into Yarmouth Roads. The Prussian master, two days after-
wards, got under weigh to proceed to London, upon which
a warrant of arrest, in an admiralty cause of salvage, was sent
off in a yawl, which overtook the Prussian vessel. The salvors
had hired this yawl for the purpose and paid £10 for her hire.
As the Prussian captain had removed his vessel from Yarmouth
without their consent, this amount of £10 was awarded in addi-
tion to their salvage, the Judge of the Admiralty Court saying:
"The salvors had a lien upon the ship, and if she had been lost
on her voyage from Yarmouth to London, they would have
lost their remedy." (17 Jur. 329, 22 Eng. L. & Eq. 615, 617.)
In that case, the salvor might have waived his right of pro-
ceeding at Yarmouth, and have proceeded at London, because
London was a port convenient to the owner of the property.
So here, the navigators of the Tay, if they had permitted the
Chilian captain to retain the effects saved, might have pro-
ceeded against them at Valparaiso. When the owner, or his
agent, has remained in possession from the time of the service
rendered, he is justifiable in removing it from the first port
of arrival if there is no proper tribunal there for the adjudica-
tion of a dispute as to the salvage, to any other conveniently
accessible port where such a tribunal is established. In a case
in which an unreasonable demand of salvage was made upon
the captain of the vessel benefited at a place which was not a
port of entry, the Supreme Court said that "it was his duty
to have proceeded to a port of entry, and to have brought the
subject before the proper tribunal, at the same time advising

the owners or consignees of the vessel of what had happened, in order that they might have an opportunity of attending to their own interests." (15 Pet. 46.) This could there have been done in a very few days. The case is quoted because the language of the Court excludes the notion that he could have required the salvors to permit him to proceed with his vessel to her home port. In cases of belligerent capture, reasons, which do not apply to cases of salvage in time of peace, render the captor's own country the proper place for adjudication. But he must carry the captured property to a *convenient* port of his own country. He cannot select his home port where reasons of convenience in favor of another port predominate. (6 Robinson, 276-278.) Next to the security of the captured property, the *convenience* which he must principally consult is that of such professed neutrals as may probably become its claimants and pray restitution. In the case of the Wilhelmsberg (5 Robinson), Lord Stowell said that the convenience of the claimant in proceeding to adjudication is one of the first things to which the attention of the captor ought to be addressed.

The master and owners are not before the Court as claimants of salvage. But, it is proper to state that, in the opinion of the Court, the omission of Captain Hughes, as navigator of the vessel, to prosecute the claim on his and their behalf at Rio would have been an insuperable obstacle to the recovery by them of any salvage compensation here. The expression of this opinion is necessary on account of its applicability to the case of Mr. Williamson, the mate, who is a party claiming salvage. His claim is disallowed. As he was on board of the burning vessel, I have had some hesitation upon the question of disallowing it entirely, or allowing him at the rate of only a common mariner. But, I am, upon reflection, convinced that it ought to be disallowed entirely. The mate of a vessel engaged in foreign trade should be so far cognizant of maritime laws and usages as to act in port with reference to them independently of the master. The 3d Section of the Act of 20th July, 1790 (1 St. 132), recognizes him as a person capable

of acting thus independently. The command of the vessel may devolve upon him, and he must be regarded as a person qualified, or professing to be qualified, to exercise the command in case of the death, absence, or disability of the master.

It would therefore be unsafe, in a case like the present, to allow his claim when that of the master and owners would be rejected.

As to the man (Blankbois) and the boy who did not leave the Tay, the rule should, I think, be applied in like manner, so as to exclude their claims. They performed no salvage service other than that incidental to the service of the *vessel,* for which, if I am right, nothing can be allowed. As between the Chilian owners and the persons concerned in the navigation of the Tay, who did not leave her, the rights of these navigators must be determined by the acts or omissions of the principal navigator, Captain Hughes. They must share the ill consequences of his mistaken conduct, as they would have participated in the benefit of his conduct if judicious and meritorious. A different rule, by multiplying exceptions from the application of a useful principle, might be vexatious and harassing in its operation upon maritime commercial interests.

The case of the second mate and six others of the crew (excluding, as above, the first mate) who boarded the burning vessel remains for consideration. They would, upon the above conjectural estimate of the salvage that might have been allowable at Rio de Janeiro, have been entitled each to about $8.00, of which one-half would have been the excess above the share of the steward who did not leave the Tay. Under the foregoing views, I cannot allow them the full amount of $8.00 each. But, subordinate seamen are governed so much by the course of conduct of the principal navigators of a vessel, and are so little able to act independently of their superiors during a voyage, that their omission to resort at the proper time and place to legal proceedings ought to be indulgently considered when indulgence can be extended without injury to other parties. To excuse their omission in a matter which concerns exclusively their own vessel would be an indulgence injurious,

as has been stated, to other interests, which are not less entitled to protection. But, when a mariner, in the performance of a salvage service, whether acting under orders or not, leaves his own vessel at sea, the service does not concern her navigation or does not concern it so exclusively as to preclude an occasional extension of the indulgence.

Therefore, if these subordinate navigators had, as salvors, any rights which could be maintained independently of acts of the principal navigator of the vessel, the case is one in which the libel ought, if possible, to be sustained in their favor.

Now, any party having an interest in property saved, or found, or otherwise taken, at sea may invoke the exercise of admiralty jurisdiction to get it out of the hands of a wrongful possessor. To rescue such property from the possession of parties by whom it might be misappropriated, and to determine questions of title to it in suits as well against actual or pretended salvors as against other persons, was a very ancient, and is likewise a familiar modern *head* of admiralty and maritime jurisdiction. It was recognized more than five centuries ago by the Aragonese Government in a controversy between the royal judge of the city of Barcelona and the consular judges of the same city as a then existing jurisdiction of the maritime court; and it has, in the present century, been more than once recognized by the Supreme Court as an existing jurisdiction of Admiralty Courts in the United States. (Capmany Mem. Hist. Sobre Comercio Antiguo de Barcelona II, 133, A. D. 1354, 4 Cranch, 347, 15 Peters, 48, 10 Wheaton, 486, 496.)

In the present case, Captain Hughes had the possession of the things saved under a claim of property which had been impliedly asserted by him to the exclusion of the just right of its owners. The proceeding at the suit of these mariners might, therefore, have been the means of rescuing these articles from an intended malappropriation, in the prevention of which the Chilian owners were interested, in a greater degree than the libellants. We now know that the owners of the Tay had recognized the title of these Chilian owners and had adopted

measures for its protection and security. But this was not known to the libellants when their suit was instituted; and had they known it, their knowledge of it would not, in this respect, have altered the beneficial tendency of the proceeding. There was thus, therefore, perhaps, a feature of judicial salvage in the proceeding itself of which the Chilian owners could not be expected to reject the benefit, and could not, with a good grace, reject the attendant burden.

Entertaining these views, though I doubt whether more than $4.00 to each of these seven libellants ought to be awarded, I have concluded to decree $6.00 to each of them for their participation in the services rendered on board of the Chilian vessel.

The usual applications for the sale of the effects arrested have been made in this case. Their absent owners would not at first have been represented by a bidder to protect their interests; and I cannot, as yet, learn whether they would be so represented if an order of sale were made now. A judicial forced sale is no legal test of value. Practically, it is often, if not ordinarily, the means of effecting a sad sacrifice. In the present case, the articles are not perishable in any other than a contingent and relative sense. Their deterioration during nine months was insignificant compared with the sacrifice that would probably have been attendant upon such a judicial sale as I was requested to order. I was, moreover, unable to arrive at an approximate estimate of their probable value. They were appraised in May, 1858, at $402. According to an allegation in the libel, the sails alone had been declared by the master of the Tay to be worth $1,500. This allegation has been sustained in one of the depositions. In January, 1859, upon a suggestion of perishableness and liability to deterioration, a commissioner was appointed to survey and examine the things, and report their true condition, and whether they *had* suffered by deterioration, or were *liable* to injury from detention, and to what extent. He reported without making the statement whether they *had* suffered by deterioration, but merely expressed his opinion that the interests of all concerned required a speedy sale, as the articles were *liable* to great de-

terioration and depreciation, and *liable* to be destroyed by rats and mildew. On questioning him orally in Court, whether there *had* been any mildew or injury from rats, or other apparent deterioration, I could not learn that any had been observed. The marshal is responsible if they suffer, in these respects, from want of proper care. Before deciding upon the course to be pursued, I asked the commissioner to state approximately, as well as he could, the value of certain articles which he had examined, comprising about three-fourths, in value, of those which had been appraised in May, 1858. These articles, according to his answers, were worth, at the *lowest* prices, *other* than those of a forced sale, $765. The appraisers had valued them, in May, 1858, at $298. According to the ratio of this difference, the articles appraised in May at $400 were in the following January worth, at low prices, more nearly $1,100. There was no suggestion of any change in the market price. The former appraisement was much more likely to have been accurate, if the proper standard had been adopted by the former appraisers. But, the difference excited an apprehension lest their standard might have been solely that of the prices which the property would have probably brought at a forced judicial sale. Independently of the general danger of sacrifice at such sales, a combination might, in this case, have been made against the interests of absent parties not represented at the sale.

In the cases of *vessels* in the custody of courts of admiralty, when they are not likely to be soon discharged upon stipulation, the reasons which induce orders of sale are peculiar. They are founded upon the chargeableness, and great liability to deterioration, of a vessel idle in the port, and upon the great loss, public and private, resulting from her non-employment. But, neither the rule nor its reasons apply to property of the description of that in custody here.

I, therefore, stated that I would not order a sale without another commission of survey and appraisement; adding that if such a re-survey should be applied for, the commission should contain special directions to regulate the course of the commis-

sioners in making the new appraisement. No application for a re-survey was made.

This case, as to the sale of the articles, was, originally, a peculiar one in the circumstance that the mode in which the articles had been brought within the Court's jurisdiction had been such as might have precluded their owners from following and tracing them to this port. But the refusal of the order of sale was not placed by the Court upon any such narrow view of the question. As a general and notorious truth, it may be said that Courts of Admiralty in all parts of the world have too often been made auctioneers for the negligent sacrifice of the property of absent owners which the casualties and vicissitudes of navigation and foreign trade have cast upon their judicial custody. No caution to prevent such sacrifices can be excessive or inappropriate.

In the case, as it now stands, if the property should not be redeemed, on behalf of its owners, by the payment of the salvage decreed in all $42, a reappraisement will be ordered with certain directions as to the mode of making it. Upon such a reappraisement made and approved, an absolute sale would be immediately ordered of any subjects of the appraisement for which any party interested or any stranger would agree to bid two-thirds of the valuation, the sale to be continued until the proceeds may suffice to satisfy the decree. If no person should agree to bid two-thirds of such valuation for any of the articles, a conditional order of sale adapted to the state of the case will be made.

Judgment that the libel be taken as confessed has not, as yet, been entered against Captain Hughes. Until after such a judgment has been entered, or such other order as to him as may be deemed proper shall have been taken, I reserve the question of his personal responsibility for the difference between full salvage and the amounts awarded to the libellants, and of his liability for the costs of the cause.

The delivery of the foregoing opinion has been suspended, at the request of counsel, in order that a responsive allegation

might be interposed by the owners of the Tay, on their own behalf, and on that of her master, who is, as I am informed, absent.   This allegation is now presented, and has been read and filed.   It does not alter any of the views which the Court has expressed.