JACOB HOUSEMAN, CLAIMANT, &c., APPELLANT, *v.* THE CARGO
  OF THE SCHOONER NORTH CAROLINA, OLIVER O'HARA,
  AGENT, &c., LIBELLANT.

The schooner North Carolina, bound from Appalachicola to Charleston, with a cargo
  of cotton, part on account of the consignees, and part the property of the shipper,
  struck on a reef about ninety-five miles from Key West; and the next morning one
  hundred and ten bales of cotton were taken from her by the wrecking schooner
  Hyder Ally, when she floated ; and she sailed with the Hyder Ally to Indian Key,
  and arrived there the same evening.  The Hyder Ally was one of those wrecking
  schooners in the profits of which Houseman was a participator.  He became the
  consignee of the North Carolina; and salvage being claimed by the master of the
  Hyder Ally, a reference was made by the master of the North Carolina, and the
  master of the wrecker, and by an award thirty-five per cent. was allowed as salvage;
  and one hundred and two bales of cotton were put into the stores of Houseman, in
  part payment of the salvage ; and one hundred dollars was paid in cash, and a draft
  for six hundred dollars, was given by the captain of the North Carolina, in further
  satisfaction of the salvage, and the commissions of Houseman, with the vessel's
  expenses.  Afterwards, the consignees of the cotton sent an agent to Key West,
  who proceeded, by a libel in his name, as agent, in the Superior Court of the
  United States of Monroe county in Florida, alleging the facts; and by pro-
  cess issued by the Court, seventy-two bales of the cotton of the North Carolina
  were attached in the hands of Houseman.  The Court decreed that the libellant
  should recover the seventy-two bales of cotton; and Houseman appealed to the
  Court of Appeals.  In that Court, a supplemental libel was filed by the appellee,
  claiming damages for the taking and the detention of fifty other bales of cotton,
  making the whole number of one hundred and twenty-two bales, which had gone
  into the possession of Houseman.  The Court of Appeals gave a decree in favour of
  the appellee, for the value of one hundred and twenty-two bales.  The Supreme
  Court affirmed the decree as to the seventy-two bales, and set aside that part of the
  decree which allowed the value of the fifty bales: leaving the consignees or owners
  of the fifty bales to proceed in the Superior Court of East Florida by a new libel
  for the recovery of the same or the value thereof.

There are many cases in which the contract of the captain, in relation to the amount
  of salvage to be paid to the salvors, or his agreement to refer the question to arbitra-
  tors, would bind the owners.  In times of disaster, it is always his duty to exercise
  his best judgment, and to use his best exertions for the benefit of both the vessel and
  cargo: and when, from his situation, he is unable to consult them or their agent,
  without an inconvenient and injurious delay, it is in his power to compromise a
  question of salvage; and he is not bound in all cases to wait for the decision of a
  Court of Admiralty.

So, too, when the salvage service has not been important, and the compensation
  demanded is a small one, it may often be the interest of the owners, that the amount

[Houseman *v.* The Schooner North Carolina.]

should be settled at once by the captain; and the vessel proceed on her voyage, without waiting even a day for the purpose of consulting them. But in all such cases, unless the acts of the captain are ratified by the owners, his conduct will be carefully watched and scrutinized by the Court; and his contracts will not be regarded as binding on the parties concerned, unless they appear to have been bona fide; and such as a discreet owner, placed in the same circumstances, would probably have made. If he settles the amount by agreement, those who claim under it must show that the salvage allowed was reasonable and just. If he refers it to arbitrators, those who claim the benefit of the award, must show that the proceedings were fair, and the referees worthy of the trust.

The case is within the jurisdiction of a Court of Admiralty. It is a question of salvage of a vessel which had been stranded on a reef in the ocean. The points in controversy are whether salvage is due; and if due, how much? The admiralty is the only Court in which such questions can be tried.

It is well settled in admiralty proceedings, that the agent of absent owners may libel either in his own name, as agent, or in the name of his principals, as he thinks best. That a power of attorney given subsequent to the libel is a sufficient ratification of what he had before done in their behalf; and that the consignees of a cargo have a sufficient interest in the cargo that they may proceed in the admiralty for the recovery not only of their own property, but for that part of it which may be consigned to them.

An amendment in a case in the admiralty, before the Court of Appeals, cannot introduce a new subject of controversy; although the most liberal principles prevail in such cases.


ON appeal from the Court of Appeals of Florida.


This case was argued by Mr. Coxe for the appellant; and by Mr. Downing for the owners of the schooner and cargo. The facts are fully stated in the opinion of the Court.


Mr. Chief Justice TANEY delivered the opinion of the Court.

This case arises upon a proceeding in admiralty, originally instituted in the Superior Court of Monroe county, in the southern district of Florida, and afterwards carried to the Court of Appeals for that Territory. It is brought here by appeal from the decision of the last mentioned Court.

Several questions have been raised in the argument upon the form and manner of proceeding in the Territorial Courts, as well as upon the merits of the controversy; and it becomes necessary to state fully the facts in the record, in order to show the points in dispute, and the principles on which they are decided.

The schooner North Carolina, George M'Intyre, master, sailed

D 2                    6

from Appalachicola about the 9th of March, 1833, laden with cotton, and bound for Charleston, in South Carolina. The cargo was shipped by William G. Porter, of Appalachicola, and consigned to J. & C. Lawton, of Charleston, part of it being shipped on account of the consignees, and part on account of Porter, with directions from him to sell his portion, as soon as the consignees thought it for his interest; and to credit the proceeds in his account.

Upon the night of the 14th of March, being five days out, the vessel struck upon the Pickles reef, which is about ninety-five miles from Key West. She was discovered on the next morning by the wrecking schooner Hyder Ally, Joshua B. Smith, master, who took from her deck one hundred and ten bales of cotton, when she floated; and both vessels sailed for the Indian Key, where they arrived the same evening. The North Carolina had grounded about twelve o'clock at night, and was got off at four o'clock in the afternoon of the following day. She sustained very little injury; not enough to have prevented her from proceeding immediately on her voyage. The weather was moderate while she was on the reef; and the Hyder Ally ran no risk, and encountered no hardship in assisting her, beyond the mere labour of taking off the portion of her deck load above mentioned, and carrying it to the Indian Key. It is stated, however, that the Pickles reef is considered a dangerous one; that it came on to blow fresh about two hours after the North Carolina was relieved; and that she would probably have been lost if she had remained on the reef the ensuing night.

The Indian Key is a small island of a few acres of land; and is about ten or twelve hours sail from Key West, where there is a port of entry, and a court of the United States having admiralty jurisdiction. It appears, by the testimony, that Houseman, the appellant, was the only man at the Indian Key who could have advanced money to M'Intyre to pay the salvage. He had a warehouse there, and owned a schooner which was employed in the wrecking business; and this vessel of Houseman's, in the language of the wreckers, consorted with the Hyder Ally, and with a sloop commanded by a man by the name of Packer; that is to say, these three vessels shared equally in the gains made by either of them. Houseman was therefore entitled to a pro-

portion of whatever could be obtained for salvage from the North Carolina; and had a direct interest in making it as large as he could. It does not appear that he was engaged in any other business except that of wrecking on the Florida coast.

Notwithstanding this interest of Houseman, he was appointed by M'Intyre, consignee of his vessel and cargo, as soon as he arrived at the Indian Key; and he charged and received commission to the amount of one hundred and fifty-six dollars and forty-five cents for his services in arranging the question of salvage, on behalf of the owners. The evidence does not show whether M'Intyre was apprised of Houseman's connection with the salvors; and in so far as this case is concerned it is not necessary to inquire whether he was or was not aware of Houseman's interest. M'Intyre's conduct leads strongly to the conclusion that he was not deceived, and that he knowingly betrayed the interest of the owners. But he is no party to this dispute. The question is between the owners and Houseman; and certainly his claim would not be strengthened by showing that he concealed his interest from M'Intyre, and obtained his confidence by leading him to believe that he had no interest in the question of salvage.

However this may be, M'Intyre was induced by some means or other to refer the matter to the arbitrament of two men, by the name of Otis and Johnson, who are described in the survey held on the North Carolina as shipmasters. But we have no account of the characters or standing of these men; nor of the nature of their business and pursuits at the Indian Key: nor have we and thing in the record to show how far their judgment and impartiality could be relied upon in the matter referred.

The referees thus chosen awarded thirty-five per cent. on the vessel and cargo; and thereupon the cotton brought by the Hyder Ally, together with so much in addition from the North Carolina, as made up the number of one hundred and twenty-two bales, were immediately landed and put into the warehouse of Houseman in payment of the salvage on the cargo, and M'Intyre gave Smith one hundred dollars in cash, and a draft on his consignees for six hundred dollars in payment of the salvage on the vessel; and it is said in the testimony, that Houseman gave Smith the money for the draft. As soon as the affair of the salvage was

settled, M'Intyre proceeded with the North Carolina on the voyage to Charleston.

Upon his arrival there, however, it would seem that his consignees were not satisfied with what he had done; and on the 18th of May following, Oliver O'Hara, the present appellee, as agent for J. & C. Lawton, the consignees of the vessel, filed his libel on the admiralty side of the Superior Court for the southern judicial district of Florida, stating, generally, that a part of the cotton composing the cargo of the North Carolina had been taken from her while lying on the Florida reef by the wrecking schooner Hyder Ally, Joshua B. Smith, master; which together with the North Carolina was carried into the harbour of Indian Key, where a large portion of the said cotton was still kept, and illegally detained from the libellant; and he prayed process against the cotton in order that it might be delivered to him. We do not profess to give the words of the libel, and state its substance in order to show that it was altogether a proceeding in rem; it did not allege that any particular person was in possession of the cotton or claimed it, but merely that it was unlawfully detained.

Process was issued accordingly, and seventy-two bales of cotton attached under it. Houseman appeared as claimant, and upon his application, it was delivered to him upon stipulation, being valued by agreement of parties at the sum of $2,376, and the security entered for that sum.

It is not necessary to state at large the further proceedings which took place in the Superior Court; nor the amendments and alterations which were afterwards made by both parties in the Territorial Court of Appeals. The pleadings and proceedings are imperfect and irregular in both courts. The particular defects which have been supposed to be material will hereafter be noticed. The Superior Court of the Territory upon the final hearing decreed restitution of the seventy-two bales above mentioned; and Houseman appealed from this decree to the Court of Appeals of the Territory, where new pleadings were filed on both sides, and where the libellant proceeded for the one hundred and twenty-two bales taken in salvage, and charged that it was forcibly and wrongfully taken, and claimed damages for the marine tort. The Court of Appeals sustained his claim for the

whole amount of the cotton, with interest and costs; increasing in its decree the valuation of the seventy-two bales beyond the sum for which the stipulation was taken in the Superior Court; and from this decree Houseman has appealed to this Court.

Three questions have been raised here in the argument.

1. Was the transaction in relation to the salvage an honest and fair one; and are the acts of the captain of the North Carolina binding upon the owners of the vessel and cargo?

2. Was the matter in controversy within the jurisdiction of the Court of Admiralty?

3. Assuming those two points to be in favour of the libellants, is there any thing in the form of the proceedings and pleadings, which will bar him of his right to recover?

Upon the first question, we have no doubt that there may be cases in which the contract of the captain in relation to the amount of salvage to be paid to the salvors; or his agreement to refer the question to arbitrators, would bind the owners. In times of disaster it is always his duty to exercise his best judgment, and to use his best exertions for the benefit of the owners of both vessel and cargo; and when, from his situation, he is unable to consult them or their agent, without an inconvenient and injurious delay, it is in his power to compromise a question of salvage; and he is not bound in all cases to wait for the decision of a Court of Admiralty.

So, too, when the salvage service has not been important, and the compensation demanded is a small one, it may often be the interest of the owners, that the amount should be settled at once by the captain, and the vessel proceed on her voyage, without waiting even a day for the purpose of consulting them. But in all such cases, unless the acts of the captain are ratified by the owners, his conduct will be carefully watched and scrutinized by the Court, and his contracts will not be regarded as binding upon the parties concerned, unless they appear to have been bona fide, and such as a discreet owner placed in the like circumstances, would probably have made. If he settles the amount by agreement, those who claim under it must show that the salvage allowed was reasonable and just. If he refers it to arbitrators, those who claim the benefit of the award must show that the proceedings were fair, and the referees worthy of the trust.

But in this case the conduct of the captain is without excuse. The salvage demanded was exorbitant. The danger of the North Carolina was by no means imminent when she was discovered by the Hyder Ally; nor did the latter incur any hazard in going to her relief. The weather was moderate, and she floated in a few hours, as soon as one hundred and ten bales of cotton were taken from her. She had sustained but very little injury, and was found to be in a condition to proceed with safety on her voyage without any repairs. And if the one hundred and ten bales, instead of being delivered to the wrecking schooner, had been thrown overboard, the North Carolina would have floated, and might have proceeded directly on her voyage. But if these agreements and this award are to be carried into execution, the owners of the cargo lose one hundred and twenty-two bales, instead of one hundred and ten. The vessel is also charged with seven hundred dollars; and the commissions and expenses paid to Houseman, amount to nearly two hundred more: so that according to this arrangement at Indian Key, the owners would actually lose between twelve and thirteen hundred dollars, by the interference of the Hyder Ally; and they would have saved that much money, if their vessel had been let alone, and had been compelled to relieve herself from the reef, by throwing the one hundred and ten bales into the ocean.

Where a demand so unreasonable was made upon the captain of the North Carolina, it was his duty to have proceeded to a port of entry, and to have brought the subject before the proper tribunal; at the same time, advising the owners or consignees of the vessel, of what had happened, in order that they might have an opportunity of attending to their own interests. He could, in a very few days, have communicated from Key West, with either Charleston or Appalachicola; and no reason whatever is assigned for this hurried and extraordinary settlement at the Indian Key. The fact that the settlement was made at such a place, under such circumstances, without proceeding to Key West, or some other port of entry, and without communicating with the persons interested, would of itself have been a badge of fraud; and if the amount allowed to the salvors, had been far less, it would yet have required clear and satisfactory proof that

it was reasonable and moderate, and for the interest of the owners, before it would be sanctioned in a Court of Admiralty.

But the transactions at the Indian Key were evidently in bad faith. In the first place, Houseman, the present claimant of the cotton, becomes the consignee of the vessel and cargo, and takes upon himself to represent the interest of the owners, when he himself is a partner with the salvors, and has a direct interest in pushing the salvage to the highest possible amount. And then, as if to give the appearance of fairness to the transaction, on his part, and as if conscious that it would need all the support that would be given to it, he endeavours to account for making the settlement at Indian Key, by showing that he and Smith, the master of the Hyder Ally, both advised M'Intyre to go to Key West, and that he positively refused; and so sensible are the parties concerned of the suspicions which such a settlement, made at such a place, would bring upon them, that a certificate is taken from M'Intyre, declaring that he had submitted to the arbitration of his own free will, and was satisfied with the award. Now if any good reason had been assigned to the salvors by M'Intyre, for his refusal to go elsewhere to settle the salvage, the Court might give some weight to their advice, and his refusal. But how does his refusal, without any sufficient reason, strengthen the cause of the claimant. M'Intyre, himself, is strongly implicated in this transaction; and his acts and declarations cannot be received to prove the innocence of those with whom he was associated. This advice and this refusal to follow it, without any apparent reason, on the part of M'Intyre, together with the certificate given to Smith, look very much like contrivances to give the colour of fairness and frank dealing to a transaction, which in truth was one of an opposite character. The mode of settlement also, is exceedingly suspicious. M'Intyre exercises no judgment upon the value of the salvage service, but it is referred. Yet, he does not appear to have known any thing about the referrees, nor have we any account of their characters, or of their fitness for such a trust. They are called shipmasters, in the survey held on the North Carolina; but we do not learn from the testimony, what kind of vessels they commanded, nor what was their business at that time, at Indian Key.

If M'Intyre meant to deal justly with his owners, how could

he- refer so grave a matter to men of whom he knew nothing, and whose situation obviously placed all their feelings and partialities on the other side. If Houseman, his consignee, made the selection for him, then both of the arbitrators were, in fact, selected by the salvors, and in that case, we ought not to be surprised at the extravagance of the award.

Upon the whole, it is clear, 1st, That M'Intyre had no authority to bind his owners by the settlement at Indian Key. 2d, That the settlement relied on by the claimant, was fraudulently made; and, 3d, That the salvors, by their conduct, have forfeited all claim to compensation, even for the service actually rendered; and the owners are entitled to recover the value of all the cotton delivered for salvage, at Indian Key.

This brings us to the second inquiry, was the matter in controversy, within the jurisdiction of the Court of Admiralty?

Now, the matter in dispute, is merely a question of salvage. A vessel stranded on a reef, extending into the ocean, and, in order to relieve her, another vessel came alongside, and took off a part of her cargo, which has been detained, together with a further portion of the cargo, for salvage. The points in controversy are, whether salvage is due, and if due, how much? Upon such questions, there can be no doubt of the jurisdiction of a Court of Admiralty; nor of its authority to proceed in rem, and attach the property detained. The Admiralty is the only Court where such a question can be tried; for what other Court, but a Court of Admiralty, has jurisdiction to try a question of salvage? The claimant in this case, was a partner with those actually engaged in the salvage service. The seventy-two bales of cotton attached, were still in his hands; and the residue had been sold by him: and whether his purchase from his partners, mentioned in the testimony, was real or colourable, he must be regarded as one of the original wrongdoers, who detains on land property, taken at sea, upon a claim of salvage, to which he has no title. In the case of Peisch and others v. Ware and others, 4 Cranch, 347, which, in principle, is perfectly analogous to this, (so far as the point of jurisdiction is concerned,) the power of the Court of Admiralty does not appear to have been questioned either by the Court, or at the bar.

The third and last point remains to be considered—whether

[Houseman v. The Schooner North Carolina.]

there is any thing in the form of proceeding, or in the pleadings, sufficient to bar the recovery of the libellant.

An objection has been taken to the right of the appellee to sue in his own name, as agent for the consignees, or to sue at all; as his power of attorney from them bears date after the libel was filed; and it has also been objected, that J. and C. Lawton, the consignees, had no right to institute proceedings to recover any thing more than their proportion of the cargo shipped on their own account.

No authority has been produced in support of these objections; and we consider it as well settled in admiralty proceedings, that the agent of absent owners may libel either in his own name, as agent, or in the name of his principals, as he thinks best; that the power of attorney, subsequent to the libel, is a sufficient ratification of what he had before done in their behalf; and that the consignees had such an interest in the whole cargo, that they may lawfully proceed in this case, not only for what belonged to them, and was shipped on their account, but for that portion also which was shipped by Porter, as his own, and consigned to them.

We have already said that the pleadings are exceedingly irregular. The goods were lawfully taken from the North Carolina, in order to relieve her from distress; and there is no room for supposing that either force or fraud was used by the Hyder Ally in order to obtain them; salvage had undoubtedly been earned; and when these proceedings were instituted, the real dispute was whether the fraudulent conduct of the salvors had forfeited their claim to salvage; and if it had not, how much was justly due. It is singular enough, that neither the libel nor the claim put in by Houseman, make the slightest mention of the real controversy; and it is not until the case is in the appellate Court, that the pleadings disclose the matter in dispute. And it is proper here, to say, that if the Court upon the testimony of the witnesses, had entertained any doubt as to the true character of the transactions at the Indian Key, that doubt would have been removed by the evasive answers of Houseman. They indicate, in a way too plain to be mistaken, his unwillingness to disclose the manner in which he obtained the cotton, which had been attached by the marshal; and his desire to conceal his

partnership concern with the Hyder Ally, and his interest in the salvage obtained from the North Carolina.

It is not necessary to remark upon the defects in the pleadings in the Superior Court of the territory where the proceedings were originally instituted; because the parties had a right to make any amendments in the appellate Court that were required to bring forward the merits of the case: and the remaining question is, whether the amendments allowed exceeded these limits; and whether a new case was not presented there, different from that which was carried up by appeal.

There were seventy-two bales of cotton condemned by the decree of the Superior Court. The libel claimed an indefinite number, but only seventy-two were attached; and as the proceeding was altogether in rem, and the libellant did not claim the value of the cotton sold, nor allege that any had been sold; the only relief he was entitled to, was the condemnation of these seventy-two bales. The claimant appealed from this decree; the libellant did not appeal. The case, therefore, carried up, was the controversy about the seventy-two bales; the libellant resting satisfied with the decree which condemned them, and the claimant seeking to reverse it. This was the res in controversy; and in so far as these seventy-two bales were concerned, either party was authorized to make amendments, or to introduce new evidence, in order to support his title in the appellate Court. But the libellant could not introduce a new subject of controversy; and the amendment which brought into the case the additional fifty bales, was the introduction of a new res, which did not go up by the appeal; and could not be originally instituted in an appellate Court. We think that this amendment is not justified by admiralty practice; although it is well known that the most liberal principles prevail in Admiralty Courts, in relation to amendments. The same may be said of that part of the libel in the Court of Appeals, which is against the claimant in personam, in order to recover damages for a marine tort, in addition to the value of the property withheld. There was no such charge made by the libellant in the Superior Court, nor any decree made there in relation to such damages; and no such question could therefore be carried up by the appeal of the

claimant.   It was a new claim, and originated in the Court of Appeals.

Neither was the appellate Court authorized to fix a higher value upon the seventy-two bales than that for which the stipulation was taken.   It was a substitute for the cotton delivered to the complainant; and upon the appeal, stood in the place of it, and represented it in the appellate Court.   It could not, therefore, be put aside, and a new valuation substituted in its place.

It follows, from these principles, that the decree of the appellate Court was erroneous.   But there was certainly enough in the pleadings to authorize the Court to affirm the decree of the Superior Court, for the seventy-two bales; and the evidence would most abundantly justify such a decree.   And as we have no doubt that the value of the remaining fifty bales are justly due from the claimant, the decree will be reversed, without prejudice to the rights of the parties interested in these fifty bales; and the right reserved to them to proceed, by a new libel in the proper Court, to assert their claims.

The decree of the Court of Appeals for the territory of Florida, must therefore be reversed, and the case remanded to the said Court, with directions to enter a decree for the value of the seventy-two bales of cotton, as fixed by the stipulation, with interest from the date of that instrument, and costs; reserving to the owners, or others interested in the cargo of the North Carolina, the right to institute proceedings, in the proper Court of Admiralty, to recover the value of the remaining fifty bales, with interest and costs.