## WILLIAM M. PECK et al. v. NASHVILLE MARINE AND FIRE INSURANCE COMPANY.

The assured are not entitled to abandon and recover for a total loss, from the mere fact of there having been a sale of the vessel; but the right rests upon the ship's being reduced to such a state as to justify the sale.

The power of a master to sell a vessel which has been damaged at sea, has been wisely circumscribed to very narrow limits. It is limited to cases of extreme necessity, and where, by reason of the distance from the scene of disaster, there is not an opportunity of consulting the owner or underwriter. The same is to be observed with regard to the power of the master to arbitrate or compromise a claim for salvage.

The report of surveyors as to the necessity of the sale of a damaged vessel, is not conclusive as to that necessity, or as to the right of the assured to abandon.

Where a vessel was damaged at Tampico, so that her salvage and cost of repairs at that place were estimated at a sum sufficient to justify an abandonment, and she was sold and brought to New Orleans, where she was repaired at comparatively a small sum, not sufficient to justify an abandonment; *Held:* That the assured could not abandon and recover for a total loss, without advising with the underwriters; as it was practicable to have brought the vessel to New Orleans, where she could be repaired upon much better terms than at Tampico.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J. *Jacob Barker* and *T. A. Clarke*, for plaintiff. *L. Hunton*, for defendants. The judgment of the court was pronounced by

SLIDELL, J. The plaintiffs sue for a total loss upon a policy upon one-half of the bark Mopang, "with liberty of ports in the Gulf of Mexico, warranted by the assured free from any loss or damage resulting from war or hostility between any nation or people, for three months." The vessel was valued at $10,000. The defendants insured the one-half at $5,000, and another office took a similar amount. The policy contained a clause that in case of capture, arrest or restraint, the insured should not abandon therefore until proof to the insurers of condemnation, or of the continuance of the capture, arrest or restraint, for at least ninety days. Also, that in case of loss or damage, the repairing and replacing of loss or damage should only be estimated or charged against the insurers, after excluding all losses or damages requiring to be repaired or replaced in consequence, in whole or in part, of wear and tear or natural decay. Also, that in case of stranding without the breaking up of the vessel, no abandonment should be made until after thirty days from its occurrence, and notice thereof to the insurers; nor unless the right to abandon should then exist. It was further stipulated, that in case a total loss should be claimed for or on account of any damage or charge to the vessel, the only basis of ascertaining her value should be her valuation in the policy.

PECK
*v.*
NASHVILLE
MARINE AND
FIRE
INSURANCE
COMPANY.

On the 29th November, 1846, the vessel departed from New Orleans for Tampico, laden with Government stores and supplies for the Army of the United States in Mexico. On the 6th December she arrived at the bar off Tampico, about six miles from that town, and there grounded. Unsuccessful exertions were made to get her off by the crew, and also by officers and men sent to her assistance by two war steamers of the United States. The weather became boisterous. *Huffington*, the master, and the crew, except one man, deeming it unsafe to remain on board at night, left the vessel and went ashore. They returned the next day, and in the evening again went ashore. During the second night the vessel was driven by the winds and waves over the bar, and was discovered next morning near the beach. A quartermaster of the United States Army employed a man named *Clifton* and one *Frederick* to proceed to the Mopang to save the cargo. For this purpose, vessels and men in the employment of the Government of the United States were used. *Clifton* was paid by the Government for his services. Thus employed, *Clifton* went on board the Mopang, after she had drifted over the bar. *Huffington* with his crew reached the vessel soon after. *Clifton* then asserted that he was a salvor, and refused to allow *Huffington* to exercise any authority as master. He was armed; and when asked by *Huffington* for his authority to hold the vessel, exhibited his bowie knife. The vessel was lightened by *Clifton* and the rest, and was then got off the beach and towed to Tampico. The expense incurred by the Government for services of men and the use of a steamboat in lightening and bringing the vessel to Tampico was about two hundred and fifty dollars. *Clifton* retained possession of the vessel, and claimed a salvage of fifty per cent. At this time, the communication between New Orleans and Tampico was frequent. *Huffington*, without waiting for any instructions from his owner and underwriters, although he was advised to do so by a merchant from New Orleans, to whom the consul referred him, had a survey called. The surveyors, three shipmasters and a master carpenter named by the consul, gave it as their opinion, on the 11th December, that it would cost more to put the vessel in complete order at Tampico than she would afterwards be worth. They therefore recommended that she should be sold at auction for account of whom it might concern. On the 14th December he agreed with *Clifton* to submit his claim for salvage to arbitration after the sale of the bark. The vessel was sold at auction for $3200. The arbitrators awarded *Clifton* fifty per cent of the proceeds of sale. They were not sworn; no witnesses were examined before them; and they acted upon the verbal statements made to them by *Clifton* and *Huffington*. The purchaser put a temporary rudder in the vessel at an expense of about $100, and without any other repairs at Tampico, she being perfectly tight, he left that place in her about fifteen days after the sale, and brought her in safety to New Orleans. She was then thoroughly repaired here, at a cost of about $800. What portion of these repairs was rendered necessary by the damage suffered in the stranding is not shown. On the 8th January, 1848, the plaintiffs presented their claim to the defendants for a total loss, and tendered an abandonment, which was rejected. In the court below there was judgment against the plaintiffs as in case of non-suit; and they have appealed.

The plaintiffs contend, that they are entitled to recover for a total loss, in consequence of the vessel having passed from them by a necessary and justifiable sale; and our first inquiry will be whether the sale was necessary and justifiable. For it is not the mere fact of a sale by the master which entitles an assured to abandon; but the ship's being reduced to such a state as to justify the sale.

PECK
v.
NASHVILLE
MARINE AND
FIRE
INSURANCE
COMPANY.

The power of the master to sell the vessel has been wisely circumscribed within very narrow limits, and its exercise is always jealously scrutinized. The authorities are conclusive in limiting it to cases of extreme necessity. And it seems also to be necessary for its justification, that there should not be an opportunity of consulting the owner or underwriter, by reason of their distance from the scene of disaster or the pressing imminence of the danger. In the present case, the vessel was completely rescued from danger at the time of sale. The means of early communication with New Orleans were at the master's command. No loss could occur by waiting two or three weeks for instructions from New Orleans, but the expenses of the vessel during the delay. It is impossible, therefore, to consider this a case of such necessity as left the master no alternative, as a prudent and skilful man, acting *bonâ fide* for the best interests of all concerned. Much stress is laid upon the recommendation of the surveyors. But it is obvious that it would be a most unsafe doctrine to hold such a recommendation conclusive. It ought not to excuse the duty of communicating with the parties interested, where such communication is convenient; nor are the proceedings themselves unimpeachable. It may be shown that the statements of the surveyors were untrue, or that their examination of the state of the ship was insufficient, or that the inferences drawn by them were incorrect. In the case before us, the surveyors are perhaps censurable on the face of their report itself, for acting upon an imperfect examination and conjectural inferences. But at all events, it is now clearly shown that they were mistaken as to the true condition of the vessel, and that their investigation must have been imperfect. See *Gordon* v. *Massachusetts Fire and Marine Insurance Company*, 2 Pick. 264.

What we have said with regard to the sale applies also to the conduct of the master, touching the claim for salvage, which is invoked as one of the causes which rendered a sale necessary. This claim was grossly exorbitant. Its exorbitance is indeed admitted in arguments by the plaintiffs. Even if *Clifton* was entitled to any salvage at all, considering the circumstances under which he was employed and took possession, and his conduct towards the master, such salvage right was far below his extravagant pretensions; and the course of the master, in agreeing to submit to arbitration without writing for instructions, and the manner of conducting the proceedings are manifestly censurable, and can give no additional color to the sale. The power of a master to arbitrate or compromise a claim for salvage appears to be regarded with a jealousy similar to that with which courts scrutinize his conduct in selling. See *Housemain* v. *Schooner North Carolina*, 15 Peters, 45.

Disregarding, therefore, the sale, as unjustifiable, let us inquire what was the extent of damage done to the ship. This, it is obvious, was far below one-half of her value in the policy. She was fully repaired in New Orleans for about $800 ; the cost of repairing her rudder at Tampico was $100 ; and these added to the highest amount reasonably due *Clifton* for salvage, and all other proper allowances, would not have reached even a third of $10,000. It is said the expense of repairing at Tampico would have exceeded the moiety. But, under the circumstances of this case, we think the cost of repairs at the place of the disaster ought not to control the rights of the parties. New Orleans, the vessel's home port, was but a few days' sail from Tampico. The vessel was able to keep the sea with the partial repairs put on at Tampico, and did actually make the voyage in safety. In *Hall* v. *Franklin*, 9 Pick. 467, the vessel which was insured at Boston, and owned partly there and partly at New Orleans, had

PECK
v.
NASHVILLE
MARINE AND
FIRE
INSURANCE
COMPANY.

struck on a shoal on the cost of Florida; but by the assistance of wreckers was got off and carried into Key West. Upon survey, she was condemned, upon the ground that her repairs there would, when finished, cost more than her value, and was thereupon sold at auction. It appeared in evidence at the trial, that although the expense of repairing her at Key West would have exceeded fifty per cent on her value, yet at New Orleans and Boston, to either of which she might have proceeded, the expense would have been less than fifty per cent. The court said, " We cannot yield to the argument that the repairs should be made at the place or port where the injury was received, if there are no reasonable means of making them at that place, and the vessel can safely be navigated to a port where the repairs can be made, so that the whole expense will be less than fifty per cent. It would in such case be the duty of the master to navigate the ship to the port where she might be repaired, and not incur the expenses of bringing men and materials from other ports to the ship."

The plaintiffs have a claim against the defendants' for a partial loss, but we have not the means of giving a judgment. It has not been shown with sufficient certainty, especially in view of the stipulation in the policy respecting repairs, what was the cost of repairing the injuries sustained by the stranding.

It is therefore decreed, that the judgment of the district court be affirmed, with costs.