233 F.Supp. 697 (1964)
LEVATINO COMPANY, Inc., Libellant,
v.
AMERICAN PRESIDENT LINES, LTD., and S.S. PRESIDENT HAYES, her engines, etc., Respondents.
United States District Court S. D. New York.
May 12, 1964.
Decree Affirmed November 5, 1964.
*698 Bigham, Englar, Jones & Houston, New York City, for libellant; F. Herbert Prem, New York City, of counsel.
Symmers, Fish & Warner, New York City, for respondents; William Warner, New York City, of counsel.
Decree Affirmed November 5, 1964. See 337 F.2d 729.
CASHIN, District Judge.
Libellant instituted this action in admiralty for short delivery and damage by freezing to two consignments, totaling 1,800 bags of fresh chestnuts, shipped on board respondent's vessel, S.S. PRESIDENT HAYES, at the ports of Naples and Leghorn in November 1960 for carriage to New York. Libellant's claim for short delivery, which involved 81 bags of chestnuts, has not been disputed by respondent, however, so that aspect of the case is not in issue.

FINDINGS OF FACT
1. In November 1960, the respondent entered into a contract of carriage to transport 1,800 bags of Italian chestnuts to New York on board the respondent's steamship "PRESIDENT HAYES". On November 22, 1960, Vincenzo Ingino delivered to respondent and the S.S. PRESIDENT HAYES, at the port of Naples, 800 bags of fresh chestnuts, consigned to shipper's order at New York under Bill of Lading #36. On November 30, 1960, the same shipper delivered to respondent and the S.S. PRESIDENT HAYES, at the port of Leghorn, 1000 bags of chestnuts consigned to libellant's order, at New York, under Bill of Lading #4. Respondent issued clean bills of lading for the said shipments.
2. The chestnuts had passed all tests and had been certified by Italian Government inspectors as being of good quality, sound and free from infestation. The chestnuts were not damaged by freezing prior to shipment. The official weather report of the Italian Government shows that no freezing temperatures existed in Italy prior to delivery of the chestnuts to the respondent's vessel in November, the month of shipment, which was confirmed by the ship's Chief Officer.
3. The chestnuts were in sound condition upon delivery to respondent's ship. The two consignments of chestnuts in question were stowed in the upper and lower reefer flats of the vessel's number five hold, lower 'tween deck and were carried from Italy to New York in refrigeration compartments of the PRESIDENT HAYES at temperatures of approximately 35° F. There is no evidence that any damage was sustained by the chestnuts during the course of the voyage.
4. The S.S. PRESIDENT HAYES berthed at respondent's Pier 9, Jersey City, on December 11, 1960. Discharge was commenced at about 10 or 10:30 P.M. on December 11, and continued until 5 A.M. on December 12, during which period 658 bags of libellant's chestnuts were transferred to the pier and covered with tarpaulins. The lower reefer flat of the PRESIDENT HAYES, which contained the remaining bags of chestnuts involved here, had not been opened for discharge.
5. A severe snowstorm occurred beginning on December 11, depositing a snowfall in the New York Metropolitan area of 17 inches. The storm began shortly after 1 P.M. on the 11th. By 7 P.M. there was one inch of snow on the ground; by midnight there were three inches of snow on the ground; by 6:50 on the morning of the 12th there were 12 inches; and by 11:50 A.M. there were 17 inches of snow on the ground, with slight flurries thereafter.
6. The United States Weather Bureau maintained records of temperature at the Battery during the times relevant hereto. These hourly temperatures appear in Appendix A. There were no material differences between the temperatures shown in Appendix A and those *699 prevailing in Jersey City in the vicinity of respondent's Pier 9.
7. Inside Pier 9, pier personnel ascertained temperatures with one thermometer serving each section of 280 feet by 150 feet. The hourly temperatures which were recorded inside the pier, for the pier sections and times relevant hereto, appear in Appendix B.
8. Chestnuts freeze at temperatures of 20° F to 28° F.
9. Pier 9 was unheated. Further, no emergency heating appliances were installed thereon at any time during the extremely cold weather libellant's chestnuts remained on the pier. There was a lack of proof that a custom exists within the Port of New York not to provide heating in piers for cargo susceptible to freezing. Rather, libellant's witness, Fetherston, Director of Port Operations for the City of New York, testified that there are at least twenty piers within the Port of New York whose whole storage areas, or a portion thereof, were heated for the storage of perishable products.
10. There was no discharge on December 12 after 5 A.M. and throughout December 13 because of the heavy snowstorm. The records indicate libellant took delivery of "667" bags of chestnuts ex Bill of Lading #4 on December 14. The remaining bags of chestnuts ex Bill of Lading #4 and Bill of Lading #36 were discharged during December 14, with discharge of all chestnuts being completed by 4 A.M. on December 15. Upon the discharge of the chestnuts from the PRESIDENT HAYES, they were placed in the lower level of Pier 9, in sections 1 and 2. Most of the chestnuts were located in Section 1, but a smaller quantity was placed in Section 2. The libellant took delivery of all the chestnuts ex Bill of Lading #36 and 141 bags ex Bill of Lading #4 on December 15. On December 16 libellant took its final delivery of these chestnuts, 172 bags ex Bill of Lading #4.
11. The usage in the chestnut trade is that the cargo be cleared through customs in advance. This was done in the instant case. It is also the custom in the trade that the chestnuts be picked up as soon as possible after discharge, usually within 24 to 48 hours after the ship arrives. As a result of the snowstorm, however, libellant's trucks could not operate through the snowdrifts on December 12 and 13 to remove the chestnuts from the pier. On December 14, the first day it was possible under existing traffic conditions to operate trucks, libellant removed 667 bags from the pier. The remaining bags of libellant's two shipments were removed from the pier on December 15, while respondent's ship was still discharging, and on December 16, one day after the discharge was finished. Libellant acted expeditiously in taking delivery of the cargo.
12. As a result of the low temperatures which prevailed while the chestnuts were on respondent's pier (see Appendix A and Appendix B), extensive freezing damage occurred. Libellant's chestnuts were inspected on respondent's pier by a Mr. Stein, a cargo surveyor having 20 years experience covering 40 to 50 shipments of chestnuts a year which included one or two frozen chestnut shipments a year. He was on the pier on December 15 and 16, 1960. The bags of chestnuts were in pallets, placed from one to seven bags high on a pallet. Some of the bags were covered with tarpaulins, but some were not. The wind, however, could blow under the tarpaulins. Mr. Stein made a written record that some of the pier doors were open. He inspected quite a few bags and observed that the chestnuts had a color much darker than the proper color. He cut open some of the chestnuts and noted that the pulp was rubbery and dried out, lacking freshness. He opened a sufficient number of bags to be satisfied as to the condition of the entire shipment under Bill of Lading #4. He took pulp temperatures which registered 26 to 32° F. He found the majority of the chestnuts to be frozen, averaging 85 to 90% of the shipment. In making his inspections he took some bags from the center of the pallets *700 as well as the outside bags and, in doing so, he spilled out the contents and examined chestnuts from all parts of the bag. From Mr. Stein's testimony, as well as from the testimony of other witnesses who inspected the chestnuts, it is clear that the freezing damage to libellant's chestnuts occurred while they were in respondent's custody on Pier 9.
13. Pier 9 was unfit for the delivery to or storage on of libellant's chestnuts under the temperature conditions prevailing during the period of storage. The chestnuts became frozen due to the unfitness of the pier, as well as to respondent's failure to provide temporary heating devices during the period of storage.
14. Had Pier 9 been equipped with permanent or even temporary heating devices, properly operated, the chestnuts could have remained thereon throughout their period of storage without becoming frozen.
15. There was some evidence submitted by respondent to the effect that freezing does not damage chestnuts. In particular, Mr. Woodruff, Chairman of the Food Processing Division, Georgia Experiment Station, testified that there is a commercial practice of freezing chestnuts for public sale. During the course of his testimony there was admitted into evidence two bags of chestnuts on which he had conducted his experiments. After giving full consideration to this testimony, however, the court is convinced that his testimony must be rejected since there was considerably more convincing and credible testimony by libellant's witnesses, who were merchants with lengthy practical experience, that freezing and thawing of chestnuts constitutes a hazard and results in damage to the product.
16. There was also much credible evidence by libellant's witnesses that it would be impractical and uneconomical to sort out or recondition frozen chestnuts, and that sale at public auction is the customary way of disposing of chestnuts in that condition. This practice was followed by the libellant herein. Libellant sold 1,719 bags at public auction at sale prices which were below the prevailing sound market value of chestnuts.

CONCLUSIONS OF LAW
I. The court has admiralty jurisdiction pursuant to 28 U.S.C. § 1333.
II. Both shipments of chestnuts were made by the same consignor, Vincenzo Ingino, who was the owner thereof. The shipments were forwarded on a consignment basis to libellant, Levatino Company, Inc., who filed suit for the benefit of the shipper, pursuant to the latter's instructions and in accord with admiralty procedure. See Houseman v. The Schooner North Carolina, 40 U.S. 40, 10 L.Ed. 653 (1841); The Thames, 81 U.S. 98, 108, 20 L.Ed. 804 (1871); Aunt Jemima Mills Co. v. Lloyd Royal Belge, 34 F.2d 120, 122 (2 Cir. 1929).
III. Respondent, a common carrier, owned and operated the S.S. PRESIDENT HAYES.
IV. Since the chestnuts were delivered to respondent in Italy in sound condition, and were received by libellant at the port of destination in damaged condition, libellant's prima facie case of liability against respondent is established. Schnell v. The Vallescura, 293 U.S. 296, 304, 55 S.Ct. 194, 79 L.Ed. 373 (1934); Schroeder Bros., Inc. v. The Saturnia, 226 F.2d 147, 149 (2 Cir. 1955). This having been established, it is the respondent's burden to bring the loss within an excepted peril. Caterpillar Overseas, S.A. v. S.S. Expeditor, 318 F. 2d 720, 724 (2 Cir. 1963); Gilmore & Black, The Law of Admiralty, 162 (1957).
V. In view of the fact that libellant's shipments became frozen while they were still on respondent's pier, the rights of the parties herein are governed by the provisions of the Harter Act, 46 U.S.C. §§ 190, 191. The Harter Act remains applicable "to the period between the discharge of cargo from the vessel and its proper delivery." Caterpillar Overseas, S.A. v. S.S. Expeditor, 318 F. 2d at 723.
*701 VI. By the provisions of Section 1 of the Harter Act, 46 U.S.C. § 190, the respondent was obliged to make "proper delivery" of the chestnuts. Although the Harter Act does not define precisely what is meant by "proper delivery", there is implicit in that term the requirement that the goods be placed upon a fit wharf at the port of destination. Caterpillar Overseas, S.A. v. S.S. Expeditor, 318 F.2d at 723; The Titania, 131 F. 229, 230 (2 Cir. 1904); Tan Hi v. United States, 94 F.Supp. 432 (N.D.Cal.1950); The Champlain, 1939 A.M.C. 9, 15-16 (SD NY).
VII. Under the circumstances of this case, Pier 9 was not a fit place for the delivery of chestnuts, a product which is susceptible to damage by freezing. The discharge of the chestnuts to an unheated wharf and storage thereon during prevailing temperatures was a failure to exercise the degree of diligence required of respondent by the Harter Act, 46 U.S.C. §§ 190, 191. Moreover, once the respondent discharged the chestnuts onto its unheated pier, it was negligent in failing to provide temporary heating to protect the chestnuts from freezing.
VIII. Respondent was not obliged to accept carriage of the chestnuts but once it did respondent was charged with knowledge of the characteristics of the cargo it accepted and it had the duty to give the chestnuts the care which their character required. Anderson v. Lorentzen, 160 F.2d 173, 175 (2 Cir. 1947); Armour & Co. v. Compania Argentina de Nav. Dodero, 1958 A.M.C. 332 (SDNY 1957), aff'd 263 F.2d 323 (2 Cir. 1959); The San Guglielmo, 241 F. 969 (SDNY 1917).
IX. The 17 inch snowstorm and resulting road conditions which prevented libellant's trucks from calling at the pier were not the proximate cause of the freezing of the chestnuts. Rather, it was the failure by respondent to protect the chestnuts against freezing. Had the chestnuts been protected against freezing, they could have remained undamaged on the pier for the relatively short period of time which elapsed before road conditions improved so as to enable libellant to remove the cargo from respondent's pier. Thus, there is no merit to respondent's contention that it should be relieved of liability herein due to the occurrence of an "Act of God." This defense is not available where, as here, respondent's negligence directly contributed to the loss. World Products, Inc. v. Central Freight Service, Inc., 222 F. Supp. 849, 851 (D.N.J.1963); The Adventuress, 214 F. 834, 839 (D.Mass. 1914).
X. Clause 12 of respondent's bill of lading provided as follows, in relevant part:
"* * * The carrier shall not be liable in any respect whatsover if heat or refrigeration or special cooling facilities shall not be furnished during loading or discharge or any part of the time that the goods are upon the wharf, craft, or other loading or discharging place."
Whether this clause is effective to relieve respondent of its responsibility for its lack of care of the chestnuts on its pier, must, however, be determined in the light of the Harter Act. Since it was clearly the intention of Section 1 of the Harter Act to declare invalid those clauses which undertake to relieve a carrier of its obligation to exercise due diligence to make "proper delivery" of cargo (Caterpillar Overseas, S.A. v. S.S. Expeditor, 318 F.2d at 722, 723), it would be contrary to the purpose of the Harter Act to permit respondent to assert this clause as a defense.
XI. Considering the frozen condition of the chestnuts, the procedure by which libellant disposed of them at a public auction was proper under the circumstances.
XII. An interlocutory decree may be settled granting judgment in favor of libellant, and referring the computation of damages to a Commissioner.

*702
 APPENDIX A
 Hourly Temperatures of United States Weather Bureau
 A.M. Hour Ending P.M. Hour Ending
 1 2 3 4 5 6 7 8 9 10 11 12 : 1 2 3 4 5 6 7 8 9 10 11 12
 _____________________________________________ : _____________________________________________
 :
Dec. 11 : 20 20 20 20
 :
 12 20 20 20 20 20 17 17 16 16 16 17 17 : 17 17 18 17 18 17 16 14 13 11 11 10
 :
 13 9 9 9 9 8 9 9 9 9 10 12 13 : 15 17 19 20 18 17 16 15 15 15 15 16
 :
 14 16 18 17 17 17 16 16 19 19 22 22 23 : 25 25 26 25 23 23 22 22 22 23 23 23
 :
 15 24 22 22 22 23 23 23 27 32 32 33 35 : 35 37 37 39 39 41 42 42 41 41 39 39

Temperatures on December 16 were in the mid and upper thirties.

*703
 APPENDIX B
 Hourly Temperatures Recorded by Personnel Inside Pier 9
 LOWER LEVEL
 Section 1 Section 2
December 11 9 P.M. 32 24
 10 34 24
 11 34 24
 12 12 Mid. 34 26
 1 A.M. 34 26
 2 32 26
 3 32 24
 4 30 24
 5 30 24
 6 30 24
 7 30 24
 8 30 22
 9 28 20
 10 28 20
 11 28 20
 12 Noon 28 20
 1 P.M. 28 20
 2 28 20
 3 28 20
 4 26 20
 5 24 20
 6 22 20
 7 20 20
 8 28 20
 9 18 18
 10 18 18
 11 16 18
 13 12 Mid. 15 18
 1 A.M. 15 18
 2 14 17
 3 14 17
 4 13 16
 5 12 16
 6 12 15
 7 12 15
 8 12 15
 9 14 15
 10 14 15
 11 14 15
 12 Noon 14 15
 1 P.M. 14 15
 2 14 15
 3 14 15
 4 14 15
 5 14 15
 6 14 15
 7 14 15
 8 15 15

*704
December 13 9 15 15
 10 15 15
 11 15 15
 14 12 Mid. 20 20
 1 A.M. 20 20
 2 20 20
 3 18 18
 4 18 18
 5 18 18
 6 18 18
 7 18 18
 8 20 20
 9 22 20
 10 24 22
 11 24 22
 12 Noon 24 22
 1 P.M. 26 24
 2 26 24
 3 28 26
 4 28 26
 5 28 26
 6 28 28
 7 28 28
 8 26 28
 9 26 30
 10 26 30
 11 26 30
 15 12 Mid. 28 30
 1 A.M. 28 30
 2 26 30
 3 26 28
 4 26 28
 5 26 28
 6 26 28
 7 26 28
 8 26 28
 9 26 28
 10 30 30
 11 30 32
 12 Noon 32 32
 1 P.M. 34 34
 2 36 35
 3 38 36
 4 38 36
 5 38 36
 6 38 36
 7 36 36
 8 36 36
 9 36 36
 10 36 36
 11 36 36

On December 16, 1960, the lowest hourly temperatures recorded in Sections 1 and 2 were in the mid-thirties.