**RUNNIN' EASY 3, INC., a Caymanian corporation, the M/V Animal House, in rem, and American Home Assurance Company, Plaintiffs,**

v.

**OFFSHORE MARINE TOWING, INC., a Florida corporation, Defendant.**

#### No. 04–60084–CIV.

United States District Court, S.D. Florida.

March 1, 2004.

---

Henry H. Bolz, III, Keller & Bolz, Miami, FL, for Plaintiffs.

John Kennedy Fulweiler, Jr., De Orchis Hillenbrand & Wiener, Miami, FL, for Defendants.

## ORDER GRANTING DEFENDANT'S

### *MOTION TO STAY AND COMPEL ARBITRATION*

COHN, District Judge.

**THIS CAUSE** came before the Court on the Defendant's Motion to Dismiss and Motion to Dismiss or Stay and Compel Arbitration filed on February 10, 2004 [DE # 4]. The Court has carefully considered Defendant's Motion [DE # 4] and supporting pleadings [DE ## 5 & 8]; Plaintiffs' Responsive Memorandum in Opposition to Defendant's Motion [DE # 6]; Defendant's Reply [DE # 7]; and the entire file in this case.

## I. BACKGROUND

### A. *Factual Background*

The pertinent undisputed facts according to Plaintiffs' Complaint are as follows: On or about October 3, 2003, the *in rem* Plaintiff vessel, the M/V Animal House, was undergoing sea trials in the Atlantic Ocean just outside the Port Everglades inlet when the captain and crew discovered that water was entering into the vessel's engine room through a broken pipe. (Complaint ¶¶ 12–13). When initial efforts to locate the source of the entry of water into the vessel's engine room proved unsuccessful, while the ship was cruising back toward its dock in Fort Lauderdale under its own power, the captain contacted the United States Coast Guard to advise them of the situation. (Complaint ¶ 14).

In response to the ship's radio call, both a United States Coast Guard vessel and Defendant's vessel responded and arrived alongside the M/V Animal House as it was approaching the entry to the Port Everglades Inlet. (Complaint ¶ 15). Subsequently, representatives of the United States Coast Guard and Defendant boarded the M/V Animal House and combined with the crew members to determine that water was entering the vessel's engine room through the vessel's fire suppression system/fire suppression pump. (Complaint ¶ 16). By around 7:45 p.m., the source of the water entering the ship's engine room had been plugged and all the water in the vessel's engine room had been pumped out. (Complaint ¶ 17). Meanwhile, one of Defendant's vessels attached a towline to the ship, and at approximately 7:45 p.m. began towing the ship into the Port Everglades basin. (Complaint ¶ 18).[1]

---

1. Plaintiffs allege that this occurred unbeknownst to the captain and crew of the M/V Animal House. (Complaint ¶ 18).

At approximately 8:15 p.m., the Defendant's personnel and equipment were removed from the ship and the towline between the Defendant's vessel and the M/V Animal House was disengaged. (Complaint ¶ 19).

That evening, the Master of the M/V Animal House signed Defendant's Standard Form Marine Salvage Contract ("Salvage Contract"). (Complaint ¶ 20 & Ex. A). The Salvage Contract contained an arbitration provision stating that "in the event of any dispute concerning the reasonableness of any fees or charges due hereunder, owner agrees, at the option of Offshore Marine Towing, Inc., to submit the dispute to binding arbitration under The BOAT/U.S. Salvage Arbitration Plan." (Complaint ¶ 31 & Ex. A at ¶ 6). The Salvage Contract further contained a "No Cure, No Pay" provision pursuant to which the Defendant agreed to perform a salvage service for a rate to be subsequently determined. (Complaint Ex. A at ¶¶ 4–6).

Following the Master entering into the Salvage Contract with Defendant, the M/V Animal House proceeded out of the Port Everglades turning basin and returned to its dock in Fort Lauderdale. (Complaint ¶ 21).

On or about October 21, 2003, Defendant submitted a salvage invoice to the M/V Animal House and its owners and insurers seeking 18% of the post-casualty value of the vessel ($575,000) for the services rendered on October 3, 2003. (Complaint ¶ 23 & Ex. B).

### B. *Plaintiffs' Claims*

Plaintiffs seek "a judicial determination of the amount to which Offshore Marine Towing, Inc. is entitled with respect to its efforts to assist the M/V 'Animal House' on October 3, 2003" (Complaint at 6), and seek "a declaratory determination from the Court that the arbitration provision of the Standard Form Marine Salvage Con-

tract ... is not binding on the Plaintiffs and that this Court has the jurisdiction and authority to determine the reasonable amount of the Defendant's claim." (Complaint at 9).

The Defendant has moved to dismiss on the basis that this Court lacks subject matter jurisdiction because the issues presented by Plaintiffs' suit are referable to arbitration. (DE # 4 at 2). In the alternative, "and in light of the federal policy favoring arbitrability of agreements embodied in the [Federal Arbitration Act], 9 U.S.C. § 1, *et seq.*," Defendant argues that this Court should dismiss the Complaint and refer the parties to arbitration, *see* 9 U.S.C. § 4, or, alternatively, stay this lawsuit and refer the parties to arbitration. *See* 9 U.S.C. § 3. (DE # 4 at 2).

### II. DISCUSSION

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, ("FAA") governs this action involving an arbitration agreement in a maritime transaction. Specifically, Section 2 of the FAA provides that:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 1 of the FAA defines "maritime transactions" as:

charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if

the subject of controversy, would be embraced within admiralty jurisdiction.

9 U.S.C. § 1. Claims arising out of salvage operations are "maritime transactions" within the meaning of the FAA. *See, e.g., Reinholtz v. Retriever Marine Towing & Salvage,* 1993 WL 414719 (S.D.Fla. May 21, 1993) ("Federal courts have long adjudicated salvage claims within their admiralty jurisdiction"; "The "no cure no pay" style of salvage contract specifically involved in this case has itself received the attention of federal courts sitting in admiralty for nearly a century") (*citing Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 640 F.2d 560, 566 & n. 5 (5th Cir.1981) ("Claims arising out of salvage operations efforts to rescue or recover ships disabled or abandoned at sea or to retrieve their cargo are, unquestionably, within the admiralty jurisdiction of the federal courts")); *see also Houseman v. The Schooner "North Carolina",* 40 U.S. 40, 48, 15 Pet. 40, 10 L.Ed. 653 (1841) ("what other court, but a court of admiralty, has jurisdiction to try a case of salvage?").

▮ With respect to the Court's jurisdiction, the FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate" but "does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331 ... or otherwise." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (further stating that "Section 4 [of the FAA] provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue. Section 3 likewise limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence"). Rather, an independent ground of jurisdiction is expressly required under both the Declaratory Judgment Act, 28 U.S.C. § 2201, and the FAA invoked in this case. *See Commercial Metals Co. v. Balfour, Guthrie, & Co.,* 577 F.2d 264, 268–269 (5th Cir.1978).

Here, the Court has independent jurisdiction over the *in personam* parties by virtue of 28 U.S.C. § 1331 because the amount in controversy exceeds $75,000, *see* Complaint ¶ 10, and there is complete diversity between those *in personam* parties. *See* Complaint ¶¶ 1, 3, & 4;[2] *see also Powell v. Offshore Nav., Inc.,* 644 F.2d 1063, n. 3 (5th Cir.1981) ("While we ... classify the vessel as 'non-diverse,' this does not mean that it is non-diverse in all senses in which a person may be so classified. For purposes of the complete diversity requirement ... we treat the vessel as neither diverse nor non-diverse, for its presence in the suit in no way implicates the rationale behind diversity jurisdiction, that is, the protection of out-of-state litigants against bias in state courts"). In addition, Plaintiff has alleged that the "towing and/or salvage services being claimed" by Defendant "constitute a maritime claim and are within the jurisdiction of this Court by virtue of the General Maritime Law and Rule 9(h)." (Complaint ¶ 9; *see also id.* ¶¶ 6–8). Accordingly, this Court has jurisdiction over this action as a threshold matter.

Under Section 4 of the FAA, "with respect to a matter within the jurisdiction of

---

**2.** Defendant does not challenge that Plaintiff Runnin' Easy 3, Inc. is a Grand Cayman corporation; Plaintiff American Home Assurance Company is a New York corporation; and Defendant Offshore Marine Towing, Inc. is a Florida corporation. Complaint ¶¶ 1, 3, & 4.

the federal courts save for the existence of an arbitration clause, the federal court is instructed to order arbitration to proceed once it is satisfied that 'the making of the agreement for arbitration or the failure to comply (with the arbitration agreement) is not in issue.'" *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Likewise, "in passing upon [an FAA Section 3] application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate." *Id.; see also John B. Goodman Limited Partnership v. The Construction, Inc.*, 321 F.3d 1094, 1095–97 (11th Cir. 2003) ("a district court must grant a motion to compel arbitration if it is satisfied that the parties actually agreed to arbitrate the dispute"; holding that it was for the arbitration panel, not the court, to determine whether underlying contracts were enforceable under state law); *Bess v. Check Express*, 294 F.3d 1298, 1304–06 (11th Cir.2002) (holding that allegation that deferred payment contract was void ab initio constituted challenge to substance rather than existence of contract containing arbitration clause and therefore was for the arbitrator, not the court, to determine); *cf. Chastain v. Robinson–Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992) ("Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general").

Here, Plaintiffs contend that there is no agreement to arbitrate because the Master of the vessel at issue did not have authority to bind the vessel owner to the Salvage Contract where the salvage demand was exorbitant and Defendant performed no salvage services after the contract at issue was signed. (DE # 6 at 5) (citing *Houseman v. The Schooner "North Carolina"*, 40 U.S. 40, 15 Pet. 40, 10 L.Ed. 653 (1841)). The United States Supreme Court in *Houseman* held that "there may be cases in which the contract of the master in relation to the amount of salvage to be paid to the salvors, or his agreement to refer the question to arbitrators, would bind the owners .... But in all such cases, unless the acts of the master are ratified by the owners, his conduct will be carefully watched and scrutinized by the court, and his contracts will not be regarded as binding upon the parties concerned, unless they appear to have been *bona fide*, and such as a discreet owner, placed in the like circumstances, would probably have made." *Houseman*, 40 U.S. at 45–48 (finding that the conduct of the master in that case was "without excuse"; "[t]he salvage demanded was exorbitant; "[t]he danger ... was by no means imminent"; and "the transactions ... were evidently in bad faith"). In this case, Plaintiffs have failed to provide any record evidence supporting either that the salvage demand was exorbitant or that the actions of the Master of the vessel were in bad faith.[3] Nor have Plaintiffs provided factual support for their position that Defendant performed no salvage services after the Salvage Contract was signed.

Defendant on the other hand has submitted the declarations of John K. Fulweiler, Esq. (DE ## 5 & 8) and Captain Scot-

---

**3.** Indeed, unlike in *Houseman*, the vessel Master in this case executed a salvage contract containing a "No Cure, No Pay" provision pursuant to which the Defendant agreed to perform a salvage service for a rate to be *subsequently* determined. *See* Salvage Contract, Complaint Ex. A, ¶¶ 4–6.

ty Roberson. (DE # 8, Ex. A). These declarations support that the radio channel used by the M/V Animal House on the night of October 3, 2003, "is to be used for getting 'the attention of another station (calling) or in emergencies (distress and safety).'" (Fulweiler decl., DE # 5, ¶ 5 & Ex. C; Roberson decl., DE # 8, Ex. A ¶ 3). Captain Scotty Roberson's declaration further supports that on the night in question he presented Defendant's Salvage Contract to the captain of the M/V Animal House *prior* to his or any other of Defendant's personnel rendering any services to the M/V Animal House; that the M/V Animal House's captain reviewed the terms of the Salvage Contract for several minutes; that during that period, Roberson specifically stated to the M/V Animal House's captain that the Defendant's services would be salvage services and not towing; that thereafter the M/V Animal House's captain signed and printed his name on the Salvage Contract; that immediately after the M/V Animal House's captain signed the Salvage Contract, Roberson dated it and entered in the upper left-hand corner of the Salvage Contract the time the M/V Animal House's captain signed the Salvage Contract as "1900 hours"; and that only after the M/V Animal House's captain signed the Salvage Contract at 1900 hours that night did Roberson and other of Defendant's personnel proceed to render assistance to the M/V Animal House. (Roberson decl., DE # 8, Ex. A ¶¶ 5–8).

Plaintiffs have not rebutted these declarations with any *record evidence.* Indeed, Plaintiff did not oppose Defendant's request—subsequently granted by the Court—that the Court review Defendant's motion on an expedited basis, (DE # 3), and did not request an evidentiary hearing or oral argument to further develop any of these or other factual issues related to whether the parties assented into entering the Salvage Contract. "A party cannot place the making of the arbitration agreement in issue simply by opining that no agreement exists. Rather, that party must substantiate the denial of the contract with enough evidence to make the denial colorable." *Chastain,* 957 F.2d at 854.

■ In any event, a complete review of the Complaint reveals that Plaintiffs' position is that the entire Savage Contract, and not merely the arbitration provision, is unenforceable. *See, e.g.* Complaint ¶ 33 ("The actions of Offshore Marine in making statements and assertions to the Master of the M/V "Animal House" that his signature was required on the ... Salvage Contract ... in order that Offshore Marine could properly submit an invoice for its towing services, and then, weeks later, submitting a salvage claim ..., renders the ... Salvage Contract void and unenforceable"); *see also* Complaint ¶¶ 28, 32, 34–35 & "wherefore" clauses at 6 & 9. Hence, this case is wholly governed by the United States Supreme Court's holding in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Under *Prima Paint,* in cases governed by the FAA, arbitration clauses are separable from the contracts in which they are included so that a claim of fraudulent inducement of the contract generally is a matter to be resolved by the arbitrator, whereas a claim that the arbitration clause itself was fraudulently induced is for the Court to decide because such a claim puts the making of the arbitration agreement in issue. *Prima Paint,* 388 U.S. at 402–04, 87 S.Ct. 1801. Specifically, the Supreme Court in *Prima Paint* held that:

> if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the

federal court to consider claims of fraud in the inducement of the contract generally .... In so concluding, we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.

Id. at 404, 87 S.Ct. 1801. That holding applies here.

█ Accordingly, this Court sends this case to arbitration pursuant to the parties' agreement, the reasoning of *Prima Paint* (*see John B. Goodman Limited Partnership*, 321 F.3d 1094), and the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital*, 460 U.S. at 24–25, 103 S.Ct. 927 ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration .... any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").

### III. CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

(1) Defendant's Motion to Dismiss for lack of subject matter jurisdiction [DE # 4–1] is hereby **DENIED.**

(2) Defendant's Motion to Compel Arbitration [DE # 4–3] is hereby **GRANTED.**

(3) Defendant's Motion to Stay [DE # 4–2] is hereby **GRANTED.**

(4) The Clerk is hereby directed to administratively **CLOSE** this case pending resolution of the arbitration proceeding.

(5) Any other pending motions are hereby **DENIED as moot.**